UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| NATIONAL FIRE & CASUALTY COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Cause No. 4:13-cv-82 |
| THE KESSLER TANK CO., INC., an Ohio corporation, | ) ) ) ) | |
| Defendant. | ) | |

**OPINION & ORDER**

This action arises out of the collapse of a 300,000-gallon water tower in Goodland, Indiana on November 7, 2011. The plaintiff, the National Fire and Casualty Company, is the insurer and subrogee of the town of Goodland, and the Kessler Tank Company is a contractor that Goodland hired to maintain and repair the water tank every four or five years between 1993 and 2007. Four claims are pending: breach of contract, breach of the implied duty of workmanlike performance, negligent misrepresentation, and negligence. For starters, we can ignore the breach of the implied duty of workmanlike performance claim because, under Indiana law, it is subsumed by the other claims. *See St. Paul Fire & Marine Ins. Co. v. Pearson Const. Co.*, 547 N.E.2d 853, 857 (Ind. Ct. App. 1989); *INS Invests. Bureau, Inc. v. Lee*, 784 N.E.2d 566, 577 (Ind. Ct. App. 2003).)

Kessler seeks summary judgment on all claims on the grounds that NFC has no expert witness and cannot satisfy its burden of proving causation without one. For its part, NFC has provided an offer of proof regarding the testimony of an expert witness this court has *three times* ruled must be excluded. Kessler has responded with a motion to strike NFC's motion, the expert's materials, and inferences drawn from them, as well as an unrelated document. For the reasons below, the motions for an offer of proof and to strike are denied, and Kessler's motion for summary judgment is granted.

## Background

To fully understand what happened here, I need to recount the story of the water tower and its maintenance, so bear with me. Goodland's history of maintaining the tower, which was built in 1960, is spotty. The first documented maintenance of the water tower took place in August 1970, when Goodland hired the K. Kessler Company ("KKC"), a predecessor of the defendant, to clean and repaint the exterior of the tank. (DE 116-1 at 175–76.)

In March 1974, KKC sent Goodland a written reminder and quotation/bid for servicing the exterior of the water tower again. (*Id.* at 169–71.) When KKC followed up with a phone call to the town, it learned that Goodland's town counsel had discussed servicing the water tank again "but decided to wait another year because of funds." (*Id.* at 173; *see also id.* at 172.) KKC's records also noted that the town was considering doing maintenance on both the interior and exterior of the tank the following year, although "[f]or some reason they have the idea that the interior doesn't need [painting] when

2

they have cathodic protection." (*Id.* at 173.) At risk of gross oversimplification, a "cathodic protection system" is a way to slow down corrosion by connecting a metal surface (like the inside of a water tank) to some other metal that more readily corrodes. (*See generally* DE 122-3 at 42 (161:14–23),[1] 43 (165:18–167:8).) When Goodland's water tank was built, it had cathodic protection, but the system was removed at some point prior to 1993. (*See id.* at 45 (174:6–13); DE 116-1 at 163 (recommending installation of one in 1993).)

In February 1975, KKC contacted Goodland again about servicing the water tank and provided an updated quotation/bid. (*Id.* at 179–80.) KKC followed up with a call to Goodland in December 1975, during which Goodland told KKC that its cathodic protection system contractor had recommended having the interior of the water tank painted. (*Id.* at 181–82.) KKC's records note that the "city [was] trying to get funds to do [the] job[,]" but there is no evidence that KKC was hired to paint the interior or the exterior of the water tower that year. (*Id.* at 182.)

In 1978—eighteen years after the water tower was built—Goodland hired a different contractor, the Leary Construction Company, to recoat the interior of the tank for the first time and to do "emergency" repairs. (*Id.* at 196, 199–200.) That same year, the town hired John "Butch" Donahue to serve as Street Superintendent and Assistant to the Water Superintendent. (*Id.* at 39 (10:13–16).) When Donahue was hired, he had no experience with water distribution systems and he warned Goodland "that if [he] went to

---

[1] Designated deposition testimony is cited to by reference to the Docket Entry and page numbers assigned by CM/ECF, with the relevant deposition page and line numbering in parentheses.

3

work for the Town [he] would not have nothing to do with that water tower." (*Id.* at 39 (10:22–11), 46 (26:16–21).) Donahue was promoted to Water Superintendent in 1980, after completing a course and passing tests required by Indiana. (*Id.* at 42–43 (13:14–14:25).)

Five years later, in 1983, Goodland hired Leary a second time to apply a wax-grease coating to the interior of the tank and to repair "[an] estimated 2,200 . . . to 2,500 . . . pits located in the bottom of the bowl." (*Id.* at 188–90.) Leary warranted the repairs "for 10 yrs., provided interior of tank is recoated each 3 yrs." (*Id.* at 190.) But Goodland did not hire Leary to come back in 3 years, instead waiting until 1989 to have Leary repaint the tank's interior for the third time. (*See id.* at 186–87.) Two years later, Leary was called back again to do some "emergency repairs," although it's not clear what the problem was. (*Id.* at 184–85.)

In 1993, approximately four years after the interior of the water tower was last painted by Leary, there was a flurry of activity. In March, a representative from Kessler visited Goodland to discuss reconditioning the water tank, and Kessler followed up with a quotation/bid for work. (*Id.* at 201–2.) (By this time, KKC, which had last serviced the exterior of the tank 23 years earlier, no longer existed and had been succeeded in interest by Kessler.) Goodland accepted that bid in August, but it's unclear if Kessler did any work at that time. (*See id.* at 203–4.)

A couple months later, in October 1993, Goodland hired the Tank Industry Consultants ("TIC"), to conduct an engineering inspection of the water tank to evaluate its structural integrity. (*Id.* at 218–20; *see also id.* at 60 (117:20–25).) Neither party has indicated

4

exactly what prompted Goodland to solicit TIC's advice, but whatever concerns the town might have had could only have been amplified when TIC issued its 28-page report. (*See id.* at 142–68.) That's because TIC concluded that the water tank would only last another 10 years, unless Goodland completed a number of repairs that TIC felt were required "to properly maintain this tank from an operational standpoint."(*Id.* at 165–67 (estimating the repairs would cost $69,000).) TIC's report advised Goodland that the interior coating of the tank "was in generally poor condition and not providing adequate corrosion protection" and "should be recoated as soon as possible [with] "an epoxy coating system."(*Id.* at 143.) The report further warned Goodland that "[a]nother application of a wax-grease coating to the interior surfaces may allow corrosion and metal [loss] to occur which will threaten the integrity of the tank." (*Id.* at 162.) Finally, the report advised the town to hire a TIC field consultant to observe the removal of the wax-grease coating by a maintenance contractor and to better "determine which pits require repair." (*Id.* at 218; *see also id.* at 167 (stating that hiring a TIC field technician to observe the maintenance contractor's work would assure the quality of the application of the protective coating)).

After it received the TIC report, Goodland opted to only do some of the recommended "minimal" repairs. It contracted with Kessler to "[f]ill all deep pits in bowl area with epoxy filler[,] weld deep pits in bowl, repair all failed seams by welding, and sandblast interior surfaces of riser column"—and for less than half of what TIC estimated the repairs would cost. (*Id.* at 223–24.) Goodland also had Kessler reapply the wax-grease coating to the interior of the tank, even though TIC had just warned the town that

5

continued use of wax-grease could compromise the structural integrity of the tank. (*Id.*; *see also id.* at 162.) There is no evidence that Goodland shared the TIC report with Kessler or that it hired a TIC field consultant or someone with engineering expertise to oversee Kessler's work or to assess which pits required repair after Kessler removed the old coating. (*See generally id.* at 13 (130:21–24), 61 (137:15–16), 265; *see also* DE 122-8 at 29 (110:18–24), 30 (115:13–18).) Instead, Butch Donahue, Goodland's Water Superintendent and the same guy who earlier said he wanted nothing to do with overseeing the water tower, supervised Kessler. (DE 122-8 at 30 (115:17–18).)

The interior of the tank was not serviced again until June 1998, when Goodland hired Kessler to reapply the disfavored wax-grease coating. (DE 116 at 228; *see also id.* at 229–31.) And by June 2000, the tank had sprung another leak, so Kessler was brought in to repair it by replac[ing] the bottom 12 [inches] of [the] riser column with new steel." (*Id.* at 235; *see also id.* 236.) In 2002, Kessler was once again hired to reapply wax-grease to the tank's interior. (*Id.* at 237–39.)

In 2006, Kessler sent Goodland a reminder that the tank had not been serviced in almost four years and provided two separate quotation/bids for maintenance—one for recoating with wax-grease and the other for epoxy, a more expensive coating and the one recommended by TIC in 1993. (*Id.* at 240–42.) Inexplicably, Goodland did not respond to the notice. Another year went by and Kessler sent Goodland another packet with updated figures for the maintenance, again providing separate bids for the wax-grease coating and epoxy coating. (*Id.* at 245–47.) Once again, Goodland took the less expensive route. They

6

did this, according to Kessler, because "Mr. Donahue was adamant about not using epoxy because it was too expensive[.]" Kessler serviced the interior of the tank (for what would turn out to be last time) on June 11, 2007. (*Id.* at 257.)

Four years later, in August 2011, Kessler sent Goodland its usual tickler about servicing the tank, along with quotations/bids. (*See id.* at 252–54.) Goodland's assistant water superintendent, who had been brought on board a few years earlier, didn't respond to Kessler because he thought the tower wasn't due for service until 2012. (*Id.* at 32 (73:9–22).) Less than three months later, the water tower collapsed, prompting this lawsuit. (*See id.* at 16.)

As noted at the outset, Kessler has moved for summary judgment on all of the claims are pending against it: breach of contract, negligence, and negligent misrepresentation. (DE 1; *see also* DE 20 (dismissing a fifth count).) NFC has filed a Motion to Make an Offer of Proof in yet another attempt to get the testimony of its expert, Steven Meier, into evidence, and Kessler has filed a motion to strike everything related to the expert and some other materials. I will address the evidentiary motions first.

## NFC's Motion to Make Offer of Proof & Kessler's Motion to Strike

NFC's motion to make an offer of proof argues that the reports of its would-be expert witness are admissible pursuant to Federal Rule of Civil Procedure 37(c)(1)[2]

---

[2] Plaintiff's motion also purports to be filed pursuant to Federal Rule of Evidence 103(a)(2), which allows a party to inform the court of the substance of evidence that the court has excluded. This is so baffling as to suggest disingenuousness because Meier's report already appears in at least *three* separate places in the record. (*See* DE 44-2; DE 47-7; DE 47-8 at 2–18.)

7

because counsel's failure to timely disclose him in violation of Rule 26(a)(1) was substantially justified or harmless:

> First, Defendant has known of the existence of Mr. Meier, his pre-suit investigation and findings and even his likely opinions since fact discovery began in earnest in this case, and certainly by the time Plaintiff disclosed Mr. Meier as a fact witness in its interrogatory answers and produced his pre-suit report, albeit in redacted form. Second, . . . Mr. Meier's proposed opinions . . . are what Defendant and its expert anticipated and, in many ways, consistent with, if not the same as, the Defendant's expert's opinion in this matter. . . .
>
> The fact remains that the identity of Plaintiff's expert in Mr. Meier, his background and experience, the foundation for his pre-suit and post-suit work, his reporting and, yes, even his opinions have remained consistent and should come as no surprise to Defendant. . . . As such, there was or should have been little or no surprise here, and the overall impact of the inversion of the normal expert process in this case turns out to be less than feared given Mr. Meier's actual opinions[.]

(DE 123 at 5.)

Plaintiff's counsel is beating a dead horse. He made these same arguments when Judge Martin pinned him down on the fact that he hadn't timely disclosed Meier as a testifying expert and instructed him to file a motion to extend the expert discovery deadline. (DE 60 at 10–11.) He also made them when he moved for reconsideration of Judge Martin's order denying the motion to extend expert discovery (DE 73 at 11–14; DE 83 at 4–6) and when he moved for review of Judge Martin's decisions by this court (DE 95 at 11–13). They were rejected every time. (DE 72 at 4–5; DE 94 at 4; DE 102 at 7).

True, the three prior orders did not expressly state that Meier's report was excluded pursuant to Rule 37(c)(1), but that's because their focus was whether Rule 26(b) entitled the plaintiff to an extension that would cure the plaintiff's Rule 26(a) violation. (*See generally* Fed. R. Civ. P. 6(b)(1); *see also* DE 72 at 5; DE 102 at 7.) If NFC had won the extension, the report would have been timely disclosed, and Rule 37(c)(1) wouldn't have been in play. When the extension was not granted, the plaintiff's violation of Rule 26(a) led to the "automatic and mandatory" exclusion of Meier's report and testimony under Rule 37, "unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Finwall v. City of Chicago*, 239 F.R.D. 494, 498 (N.D. Ill. 2006) (citing *Keach v. U.S. Trust Co.*, 419 F.3d 626 (7th Cir. 2005); *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735 (7th Cir. 1998)).

And there's no doubt that the plaintiff's Rule 26(a) violation was neither substantially justified nor harmless. The factors to consider in making that determination—one that district courts are given broad discretion to make—are "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (citations omitted). Judge Martin found that Kessler would be prejudiced by the inversion of "[t]he normal order of expert disclosure" and that the prejudice could not be cured by reopening expert discovery

9

because of "the additional advantage to Plaintiff of having already received Defendant's expert's testimony." (DE 72 at 4–5; *see also* DE 94 at 4.) Judge Martin also recognized that granting the plaintiff an extension would further delay an already dilatory trial. (*Id.*) Finally, and significantly in the context of Rule 37(c)(1), he found that counsel made misrepresentations to the court about plaintiff's failure to comply with the deadline and concluded that the failure to disclose Meier was, at best, "due . . . to extreme neglect" and, at worst, "intentional gamesmanship" by plaintiff's counsel. (DE 72 at 4; *see also* DE 102 at 6–7 (summarizing failures of plaintiff's counsel to apprise court of the discovery violation).)

In sum, I believe that Judge Martin's November 2, 2015 order made it plain to everyone that the plaintiff's Rule 26(a) violation was not substantially justified or harmless and that Meier therefore must be excluded. What's more, there can be no doubt that the plaintiff understood that Meier would be excluded because it was on that ground that Goodland asked Judge Martin to reconsider and, later, asked me to review Judge Martin's decision. (*See* DE 73 at 15 ("Denying Plaintiff leave to submit it Rule 26 expert report is tantamount to dismissal of Plaintiff's claims[.]"); DE 75 at 6 (referring to "the Court's refusal to allow Plaintiff to submit its Rule 26 expert report"); DE 95 at 18 ("[A]bsent expert testimony to establish causation, summary judgment in the Defendant's favor may be a foregone conclusion.").) To the extent there was any ambiguity in the court's rulings, let me be clear now: Goodland's Rule 26(a) violation was neither

10

substantially justified nor harmless. As a result, Meier's expert testimony, report, declaration, and curriculum vitae are inadmissible pursuant to Rule 37(c)(1), and NFC may not rely on such expert evidence in to oppose Kessler's motion for summary judgment.

That's not quite the end of the matter, though, because in response to Kessler's motion to strike, NFC argues that, if he can't testify as an expert, then Meier should be allowed to testify as a fact witness because he was timely disclosed as such and because rust and corrosion are matters of common knowledge. (DE 128 at 2–13.) This really strains credulity. To begin with, Meier was *not* timely disclosed as a fact witness. NFC first listed Meier as a witness on November 15, 2015—more than six months after the close of fact discovery and one day after NFC lost its motion to extend the expert discovery deadline. (*See* DE 37; DE 122-6.) As a result, Kessler had no opportunity to depose Meier or subpoena documents before discovery closed. This fact distinguishes this case from two cases that NFC relies upon in its brief. (DE 128 at 3–5 (citing *Musser v. Gentiva Health Servs.*, 356 F.3d 751 (7th Cir. 2004), and *Collier v. City of Fort Wayne*, No. 1:15-cv-104, 2017 WL 1325428, at *4 (N.D. Ind. Apr. 11, 2017)).) In both *Musser* and *Collier*, expert testimony was excluded for failure to timely disclose but the court allowed the witnesses to testify as fact witnesses. 356 F. 3d at 757–58; 2017 WL 1325428, at *3. The important difference between *Musser* and *Collier* and this case, though, is that there the would-be experts *were* timely disclosed as witnesses *before* discovery was

11

closed, so the defendants were able to conduct discovery. *Id.* Kessler had no such chance because the plaintiff never disclosed Meier as any sort of testifying witness until six months after discovery had closed.

The third case that NFC cites in support of its quest to recast Meier as a fact witness, *United States v. Christian*, 673 F.3d 702, 708 (7th Cir. 2012), is completely inapposite. There, the question was whether the same person can testify both as an expert and as a lay witness; here, of course, it's whether the plaintiff can do an end-run around a court order barring expert testimony by recasting the would-be expert as a lay witness. And the answer to that question has got to be "no."

Meier has significant specialized knowledge and experience and was hired by the plaintiff to figure out why the water tank collapsed. All of his observations were made in that context, and, as one would expect his report and his declaration (which plaintiff wants me to admit) are chock full of observations that only an expert witness would make. For example, in his supplemental declaration he observes that some parts of the water tank had "minimal" wax grease while in other spots there was "no observable evidence that wax grease had been applied[,]" and he opines that the tower collapsed due to "the failure of the steel angle compression ring[,]" which he says failed "due to corrosion," and that Kessler failed to properly apply the wax grease coating. (DE 123 at 15 (¶¶ 27, 29, 33); *see also id.* (¶ 34) (stating "a cathodic protection system does not reduce the corrosion of the immersed metal tank").) These are the observations

and conclusions of an expert—one whose testimony has been excluded because of plaintiff's failure to follow the rules—and there is no basis upon which to undo that now by pretending that Meier is a fact witness.

For all of these reasons, NFC's motion to make an offer of proof is denied, and Meier's testimony will remain excluded. Because I will not rely on any of Meier's expert opinion evidence, Kessler's motion to strike is denied as moot with respect to NFC's motion and Meier's materials.[3]

### Kessler's Motion for Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A nonmoving party is not entitled to the benefit of "inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quotation marks and citations omitted).

---

[3] The remainder of Kessler's motion to strike pertains to marketing materials that NFC might use to establish the standard of care for Kessler. (DE 126 at 12–13.) For the reasons set out in the following section, however, it's not necessary to determine the standard of care because it's clear that NFC cannot establish that Kessler's conduct caused the water tower to collapse. Accordingly, the remainder of the motion to strike will also be denied as moot.

13

*Breach of Contract and Negligence Claims*

NFC alleges that Kessler breached its contract with Goodland and was negligent because it failed to apply the wax-grease coating at the correct thickness and throughout the interior of the water tank, didn't adequately inspect the tank to determine the extent of rust and corrosion, and didn't discover or tell Goodland about rust and corrosion that was so bad that it threatened the water tower's structural integrity. (DE 1 at 2–3, 9–10.) But these claims require NFC to establish a causal link between Kessler's conduct in 2007 and the collapse of the water tower in 2011. (*See* DE 116 at 13–17; *see also Farah, LLC v. Architura Corp.,* 952 N.E.2d 328, 336 (Ind. Ct. App. 2011); *Thomas v. State,* 698 N.E.2d 320, 322 (Ind. Ct. App. 1998).) And there is no evidence of that link.

This a not a case in which no expert testimony is necessary to prove causation because a jury would be "as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation.'" *Cyrus v. Mukwonago*, 624 F.3d 856, 864 (7th Cir. 2010) (quoting *Salem v. U.S. Lines, Co.*, 370 U.S. 31, 35 (1962)). At a minimum, expert opinion evidence would be necessary to help a jury assess a number of possible alternative explanations for the water tower's collapse, including corrosion that developed during Goodland's initial 18-year delay in servicing the interior of the water tank, the town's failure to effectuate the "minimum" repairs that TIC identified in 1993

14

as necessary to ensure the tank would remain operational beyond 2003, the removal of (and failure to replace) the cathodic protection system, Goodland's refusal to pay for a more expensive epoxy coating even after TIC warned that continued use of a wax-grease coating would threaten the structural integrity of the tank, and the corrosive effects of Goodland's water itself, which apparently had a high sulfur content. *See Beilskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 899 (7th Cir. 2011) (finding summary judgment was appropriate where there was no expert opinion evidence to establish a causal link to the defendant and to eliminate alternative causes of the harm).

Nor can NFC rely upon the testimony of Kessler's expert witness, Chad Fischer, to establish causation. (DE 122 at 26–30.) I agree with NFC that, theoretically, it could offer testimony by Fischer, even though he was not disclosed as a witness by Goodland or NFC. *See generally S.E.C. v. Koenig*, 557 F.3d 736, 744 (7th Cir. 2009) (holding that Rule 26(a)(2)(A) does not require disclosure of an opponent's expert as a witness). But nothing in Fischer's expert draws a causal link between Kessler's painting of the tank in 2007 and the tank's collapse in 2011.

NFC notes that Fischer opines that "the cause of the tower collapse was rust and corrosion of [the] compression ring on the inside of the water tower." (DE 122 at 26.) True, but where is the link between what Kessler did in 2007 and the rust and corrosion that apparently existed in 2011? Fischer testified at his deposition that he believed Kessler had appropriately applied the coating and that there was "no indication that the

15

coating was improperly installed." (DE 122-3 at 32 (123:15–17); *id.* at 34 (131:1–7).) He also denied that it was the absence of a coating that caused the corrosion and stated instead that the compression ring might have corroded to the point of failure even with a proper coating. (*Id.* at 34 (132:19–23); *id.* at 35 (133:11–24).) Finally, Fischer testified that, although Kessler would have seen rust on the compression ring in 2007 "just like you would have seen surface rust everywhere on the tank" it wouldn't have been able to "visually tell that it's rusted down as badly as it [was]" or determine the thickness of the metal without taking ultrasonic measurements. (*Id.* at 31–32 (118:4–121:4).) In his opinion, "someone looking at it wouldn't know that it had corroded to the point where it could fail." (*Id.* at 31–32 (120:10–121:4).) Under these circumstances, it would be unreasonable to infer based on Fischer's testimony that it was Kessler who was at fault for the water tower coming down.

Even more damning to NFC's theories, Fischer testified at his deposition that "95 percent of the corrosion [that existed in 2011] might have been . . . there in 1993 already"—when Goodland paid an engineering firm to inspect the tank, was informed of very significant structural problems that needed to be addressed "immediately," and was warned that failure to do so could lead to premature failure of the water tank as early as 2003. (*See id.* at 37 (143:19–22); *see also* DE 116-1 at 142–68.) Fischer further opined that Goodland should have hired someone to do "regular engineering inspections of the tank," paid to have a "better coating" applied, and "maintained [the]

16

cathodic protection" that was in place when the tower was first built. (DE 122-3 at 30 (115:5–18).) Goodland did none of those things, and so, if anything, Fischer's testimony is at least as likely to suggest that it was decades-long and financially-driven neglect by Goodland that caused the water tower to collapse. (*See* DE 116-1 at 101 (134:1–14).)

At bottom, NFC has no way to prove that the work Kessler did or didn't do in 2007 caused the water tower to collapse in 2011, and that deficiency is fatal to NFC's breach of contract and negligence claims. Summary judgment must be granted.

*Negligent Misrepresentation*

The complaint alleges that Kessler negligently misrepresented that Goodland's water tank was structurally sound and that no additional repairs were needed to ensure that the tank would not collapse. (DE 1 at 8.) More precisely, NFC's claim is that the foreman of a crew who worked on the tower in 2007 told the president of the town council that the tower would stand for another 50 years and that Kessler *failed* to tell Goodland that additional repairs were needed. (*See* DE 122 at 37–38; *see also* DE 122-8 at 34 (132:4–15); DE 122-8 at 30 (114:16–24).) Kessler moves for summary judgment on this claim on several grounds, but the one I want to focus on is the argument that Indiana law only countenances negligent misrepresentation claims against defendants whose primary function is to render professional opinions. (DE 124 at 18–19.)

NFC argues that Kessler's president, Cody Smith, unequivocally testified that he is a "professional" and that's good enough for putting the question of whether Kessler

17

was the kind of professional who can be sued for negligent misrepresentation to a jury. (DE 122 at 36.) I disagree. The tort of negligent misrepresentation is an exception to the economic loss rule and was initially recognized under Indiana law only in the employer-employee relationship. *See Eby v. York-Division, Borg-Warner*, 455 N.E. 2d 623, 628–29 (Ind. Ct. App. 1983). Later, Indiana courts started allowing the tort to be maintained against defendants who were "professionals whose actual calling requires the giving of opinions . . . [and] whose primary functions is to render actionable professional opinions." *Id.*

The parties have not identified any case law regarding whether a painter, a water tank maintenance company, or the like could be considered that sort of professional, but the Indiana Supreme Court adopted the following "helpful considerations" for making this determination:

> the usual cost and difficulty of ensuring the accuracy of the information . . . ; the usual size of the loss if the information is false; whether the actor is compensated for supplying the information; whether the actor is in the business of supplying the information; whether imposing liability is likely to dry up a source of useful information because the expected cost of liability is disproportionate to the expected benefit to the actor of supplying the information . . . ; the ability of the recipient to determine the accuracy of the information itself; whether the actor affirmatively vouches for the accuracy of the information or its use of care in supplying the information; whether people in the circumstances of the case usually could and generally do determine responsibility for such loss by contract; whether other bodies of law are better suited to determining the actor's liability; the superiority of the actor's knowledge or expertise; whether the information is given deliberately; whether the

> information is given in response to a request by the claimant; the specificity or generality of the information; whether the misstatement is by commission or omission; whether the information is supplied to guide the claimant in a transaction with another; and whether the relationship between the actor and claimant is adversarial or advisory.

*U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 748–49 (Ind. 2010) (citations omitted).

Taking into account those considerations, I have no doubt that Kessler is not the kind of professional against whom a negligent misrepresentation claim under Indiana law can be maintained. Goodland hired Kessler "to provide all labor, material, and equipment required" to clean and paint the inside of the tank. (DE 116-1 at 242–47.) Kessler's relationship with Goodland "was one of salesperson-customer[,]" and any representations Kessler made about inspections it would do or had done were statements made in pursuit of a future sale. *See Pain Ctr., LLC v. Origin Healthcare,* No. 1:13-cv-133, 2014 WL 6750042, *7 (S.D. Ind. Dec. 1, 2014). Indeed, Kessler's "inspections" were always incidental to Kessler's painting services and provided free of charge. Kessler never made a dime by doing inspections, but, if it vouched for the structural integrity of a water tank and was wrong, the loss would likely be 100% (i.e., collapse of the water tower) and that the liability imposed on Kessler would be extraordinarily disproportionate to any expected benefit to Kessler.

19

Also worth considering here is that the only affirmative representation that NFC takes issue with—that the water tower would stand for another 50 years—was made in the most offhand of ways: spoken by the foreman of a team of manual laborers, standing near the water tower in a field right after finishing a job he considered well done. Kessler simply wasn't a professional advisor. It wasn't hired to assess or opine on the structural integrity of the water tank, and it can't be held liable for not doing that or for doing it negligently.

**ACCORDINGLY:**

(1) NFC's Motion for Offer of Proof (DE 123) is **DENIED**;

(2) Kessler's Motion for Summary Judgment (DE 115) is **GRANTED** on all claims, and the Clerk of Court is **DIRECTED** to treat this matter as **CLOSED**; and

(3) Kessler's Motion to Strike (DE 125) is **DENIED AS MOOT**.

**SO ORDERED.**

ENTERED: July 18, 2017.

                                         s/ Philip P. Simon
                                        JUDGE, UNITED STATES DISTRICT COURT